**Donnie HAMILTON, Appellant,**

v.

**RUBY CONSTRUCTION COMPANY et al.,
Appellees.**

Court of Appeals of Kentucky.

Jan. 29, 1971.

Louis V. Mangrum, Mayfield, for appellant.

James L. Hardy, Terrell, Schultzman & Hardy, Paducah, for appellees.

EDWARD P. HILL, Jr., Judge.

The Workmen's Compensation Board allowed appellant compensation for temporary total disability from November 16, 1967, to May 29, 1969, and 25 percent permanent partial disability after May 29, 1969. On appeal by appellant to the circuit court, the board's award was affirmed. This court likewise affirms the award.

First we relate the facts. Appellant, a 29-year-old farmer with an 11th-grade education, began working for appellee on highway construction five weeks before his injury on November 16, 1967. He received a back injury while operating a packing machine. After some days in and out of the hospital in Fulton, Kentucky, he was confined in Fuller-Morgan Hospital, Mayfield, Kentucky, for eight days with Dr. Donald G. Haugh as his attending physician. Since his release from the hospital, he has done some light construction work and admits performing considerable farm work, which did not require strenuous efforts.

Appellant's main argument is that he was entitled under the evidence to compensation for total permanent disability under the rules announced by this court in Osborne v. Johnson, Ky., 432 S.W.2d 800 (1968). Inferentially he argues that under the evidence he should have received an open-end award; that the evidence taken as a whole shows appellant was unable to perform the usual and customary duties of a construction worker in July 1969; and that there was no evidence presented of a change in that condition. This court does not so interpret the evidence.

Appellant's physician, Dr. Haugh, gave this answer relative to appellant's disability:

"A. I would go chiefly or I would say I would go almost entirely on my knowledge of the patient. I have known him for several years and I feel that I would—that when he came in complaining of back etc. he wasn't malingering and that he's honest in saying that he does have some back pain and so I feel that he does have some back pain and I would feel that he has a 10% disability of the back although, as I say, it is based chiefly on my knowledge of Mr. Hamilton's character and his honesty etc.

\* \* \* \* \* \*

"Q. That's correct. You are saying his impairment to the body as a whole is 10%?

"A. Yes."

The board had before it also the testimony of Dr. Marcus J. Stewart, an orthopedic surgeon with Campbell Clinic, Memphis, Tennessee, which shows he examined appellant twice and that he gave instructions for specific back exercises, which appellant abandoned after a short period of compliance. Dr. Stewart was questioned and answered as follows:

"Q. Could you make a forecast with a reasonable degree of medical certainty as to the percentage of minimal disability that you spoke of?

"A. I would say five per cent or less of the back.

\* \* \* \* \* \*

"Q. Doctor, now when you say five per cent or less, you mean functional disability to the back is that correct?

"A. That is correct.

\* \* \* \* \* \*

"Q. But you would limit him to lifting 50 pounds? Would you place any limitations at all on him?

"A. As I have said several times, I think he ought to get on an exercise program and carry it through. Let him build into it. I thought then he could do it in a few weeks if he would do it.

"Q. Doctor, I believe you did say this. You can't say with medical certainty that his back muscles will be rehabilitated completely through the exercises, can you?

"A. No, sir, but I can say that similar cases do rehabilitate them very satisfactorily.

"Q. Well, Doctor, I would say this. Isn't it also true that many people injure their back and that they never again are restored to the condition they were in prior to the injury?

\* \* \* \* \* \*

"A. Most people of this age, with as minor aliment as this man has, do restore it in my opinion and in my practice.

"Q. But you will admit, Doctor, that many of them aren't, are they?

"A. Some are not, yes, sir."

■ In the light of the foregoing evidence, we cannot say that proof was so strong and convincing as to compel a finding of total permanent disability by the board. Parks v. Beth-Elkhorn Corporation, Ky., 442 S.W.2d 589, and Young v. Dale, Ky., 446 S.W.2d 288.

■ Returning to appellant's "main" argument that he is entitled to an award for total permanent disability under Osborne v. Johnson, supra, it must be borne in mind that appellant only worked on construction work five weeks before his injury. It is difficult to say he was a skilled worker in construction work. In fact, he was a farmer before the injury as well as thereafter. He did considerable construction work after the injury, but of a lighter character, such as building guardrails and seeding sloping areas along the highway.

His total income in 1968 exceeded his income for 1967.

With these facts in mind let us turn to some of the language in Osborne v. Johnson, 432 S.W. at page 802:

" 'Compensable disability is inability, as the result of a work-connected injury, to perform or obtain work suitable to the claimant's qualifications and training. The degree of disability depends on impairment of earning capacity, which in turn is presumptively determined by comparing pre-injury earnings with post-injury earning ability; the presumption may, however, be rebutted by showing that post-injury earnings do not ac-

curately reflect claimant's true earning power. * * *

" 'Total disability may be found, in spite of sporadic earnings, if the claimant's physical condition is such as to disqualify him for *regular* employment in the labor market. * * *' Larson's Workmen's Compensation, Vol. 2, sec. 57.00.

"If occupational disability is the basis for compensation and if, as seems clear, it means impairment of earning capacity, it would seem that all that need be determined in a compensation case, as concerns disability, is: To what extent has the injured workman's earning capacity been impaired? And it would seem that this would involve only these determinations: (1) What kind of work normally available on the local labor market was the man capable, by qualifications and training, of performing prior to injury; (2) what were the normal wages in such employment; (3) what kind of work normally available on the local labor market is the man capable of performing since his injury; and (4) what are the normal wages in such employment? Larson says:

" 'The proper balancing of the medical and the wage-loss factors is * * * the essence of the "disability" problem in workmen's compensation.' Larson's Workmen's Compensation, Vol. 2, sec. 57.10.

"Degree of disability is calculated under most acts by comparing actual earnings before the injury with *earning capacity* after the injury.

\* \* \* \* \* \*

"Under the foregoing concept *medical percentages* are not determinative. The real question is: How much less money can the injured workman command in the labor market? The doctors' testimony should be addressed to the question of what job requirements the injured man is physically capable of performing (tak-

ing into consideration his qualifications and training). The board's determination of the extent to which the man's earning capacity is impaired then should be made on the basis of evidence as to the existence, in the local area or region, of regular employment opportunities for the type of work the medical testimony shows the man is capable of performing, and the prevailing wage rates in such employment."

We do not think that the facts in the instant case required a finding of total permanent disability by the board under the rules announced in Osborne v. Johnson.

The judgment is affirmed.

All concur.